No. 8529.

GREIGER v. SALZER ET AL.

1. INSURANCE COMPANY—*Liability of Commissioners for Incorporation.* Section 3117 of the Revised Statutes rules the organization of insurance companies, wherever in conflict with other provisions relating to the incorporation of stock companies.

The defendants were named as directors in the articles of association of a proposed insurance company, and were appointed by the Commissioner of Insurance to procure subscriptions to the stock of such company. The amount necessary, under Rev. Stat. 3112, to enable the corporation to proceed to business was never raised, and the project was abandoned.

Defendants were held individually liable to every subscriber to the stock, for the money which he had paid in, even though some of them had resigned as directors, and never, as individuals, received any of the money.

The defendants having presented to the Commissioner of Insurance the copy of the articles of the association of the proposed corporation, wherein they were named as directors, held they were not to be heard to deny knowledge of their appointment as commissioners, or the duties incumbent upon them.

The literature circulated, with their knowledge, to obtain subscriptions to the stock, held to fully establish their knowledge.

That the proposed corporation, itself, undertook the securing of the subscriptions to the stock, collected the subscriptions, and used the funds to defray expenses, was held no defense, all this being done with the consent of the commissioners.

The corporation, it was held, was in law, merely the agent of the commissioners, and they were individually chargeable with all its acts.

2. PARTIES—*Defendants.* Action by subscriber to stock of an abandoned and defunct insurance company, against the commissioners appointed under Rev. Stat., Sec. 3117. *Held* the corporation was not a necessary party.

*Error to Denver District Court, Hon. John H. Denison, Judge.*

Messrs. BARNETT & CAMPBELL and Mr. JOHN E. FETZER, for plaintiff in error.

Messrs. DOUD & FOWLER, Messrs. HAYT, DAWSON & WRIGHT, Mr. S. E. MARSHALL, and Mr. ISHAM R. HOWZE, for defendants in error.

Mr. Justice Bailey delivered the opinion of the court.

THIS action is to recover money paid for shares in a projected life insurance company, undertaken to be organized under the laws of the state, but never in fact perfected. Defendants below, defendants in error here, with others, filed with the Secretary of State articles of incorporation for The United States Postal Insurance Company, with a capital stock of $1,000,000.00, divided into 10,000 shares of $100.00 each. In conformity with sec. 3117, R. S. 1908, there was presented to the State Insurance Commissioner, at the same time, a certified copy of such articles, for his approval. These were duly certified by the Attorney General as conforming to law, and returned by him to the Insurance Commissioner, who thereupon approved the same, and, under the statute, named the defendants to take subscriptions to the stock of the company, they having been designated in the articles as its board of directors for the first year. Books were opened for subscriptions, and, under the direction and control of the defendants, meetings were held, at which company by-laws and an official seal were adopted, and other preliminary steps taken. Stock was sold, some of which was paid for in full, other subscriptions were partly paid, and there were still other sales upon which nothing was ever paid. It appears that nearly $76,000.00 was collected from such sales, about $66,000.00 of which was spent in salaries, general, incidental and promotion expenses. Having failed to secure subscriptions and collections for the amount necessary to perfect the organization, the proposition collapsed,

and the question now is whether the defendants are liable for a return of the money so subscribed and paid in.

Plaintiff below, plaintiff in error here, bases his right to recover upon the statute of the state governing the incorporation of insurance companies, and upon general principles. At the close of his testimony, on motion, an order of nonsuit was entered, and the cause is here for review on error.

Sec. 2117, *supra*, upon which the plaintiff chiefly relies, reads as follows:

" * * * they" (the incorporators) "shall file a copy of the articles of incorporation with the commissioner of insurance, who shall submit the same to the Attorney General for examination; and if found by him to be in accordance with the provisions of this act, and not inconsistent with the constitution of this state, he shall certify and deliver back the same to the commissioner, who shall commission the persons named in the certificate of incorporation, or a majority of them, to open books for the subscription of stock in the company, at such time and place as they shall deem it convenient and proper, and shall keep the same open until the full amount specified in the certificate of incorporation is subscribed.

"Whenever such capital stock has been subscribed, and not less than the amount required by this Act shall have been fully paid in, and deposited with the commissioner of insurance, as required by this act, they shall notify the commissioner, who shall cause an examination to be made, either by himself or some disinterested person, especially appointed by him for this purpose, who shall certify under oath that the provisions of this Act have been complied with by said company, so far as applicable thereto. Such certificate shall be filed in the office of said commissioner, who shall thereupon deliver to such company a certified copy thereof which shall be recorded in the office of the recorder of deeds of the county wherein the company is to be located, before the authority to commence business is granted."

Sec. 3112, R. S. 1908, provides that no life insurance company shall be permitted to be incorporated for business until a deposit of $100,000.00, either in cash, or in approved securities, is made with the state, as a guarantee fund to protect policy holders, and the business of the company.

Plaintiff contends that under sec. 3117, *supra,* the commissioners therein mentioned are trustees of an express trust, and their duties are to conserve the funds received from the sale of stock, to deposit the statutory amount with the Commissioner of Insurance, and that until the stock has been fully subscribed and the required amount of money so deposited, they are personally liable for the preservation and integrity of such fund.

A decision of the issues depends upon a construction of the sections of the statute referred to above. If these sections are wholly without import, then possibly the defendants may escape liability, but if, on the other hand, they are to be ascribed significance and meaning, then the defendants ought to be held to respond according to their express mandate.

These sections are distinct from the law governing the incorporation of other companies. They were enacted to safeguard the rights of those taking policies in such companies, and beneficiaries thereunder. The legislative idea manifestly was to prevent any company from lightly and prematurely assuming liability imposed by the issuance of policies of insurance. Under the statute no company may issue a policy until after all of its capital stock has been subscribed, a deposit of certain amount of funds made with the Insurance Commissioner, and upon certificate from that official attesting that these conditions have been complied with. The State Insurance Commissioner is required by law to designate the persons, or a majority of them, who are named in the certificate of incorporation, to assume the responsibility of securing stock subscriptions, of collecting the same, and of turning over such collections, in amount to meet the demands of the statute,

to the proper State official, before the company may undertake business. It is plain that during this embryonic period the affairs of the projected company are governed by these sections, and the duties and liabilities of those named for the preliminary work are determined and controlled thereby. These duties are positive and explicit, and unless the statute be applied and enforced those named as commissioners are without restraint, regulation, or direction whatsoever, and may make such disposition of the stock and assets of the company as meets their pleasure or whim. The legislature could never have intended or contemplated such a situation. The statute is a child of experience, and is calculated to abate, or at least minimize, evils which have arisen in the past in the organization and conduct of insurance companies. Unless it can be construed to accomplish such end, it is impotent for any purpose, and the legislature which achieved it has produced a worse than useless thing. The commissioners under the statute were to get the entire capital stock of the company subscribed, and to collect thereon and pay over to the Commissioner of Insurance at least $100,000.00. Their responsibilities ceased only when these duties were performed. The fund to be raised was for a specific purpose, and could not lawfully be diverted. Neither was the organization itself complete, nor could it lawfully do business, until the commissioners had performed their duties in this connection.

The statute is special in character, was passed after the general act, and rules the organization of insurance companies, wherever repugnant to or in conflict with provisions relating to the incorporation of stock companies in general. This is fundamental. 36 Cyc. 1151. The principle is declared in this State in *Burnet v. Tucker Lumber Co.,* 2 Colo. 470; *Edwards v. D. & R. G. R. R. Co.,* 13 Colo. 59, 21 Pac. 1011.

The record shows that the defendants set out to perform some at least of their duties under the statute; offices were rented, books were opened, and stock subscriptions were

received and money collected thereon. An attempt was made to complete the organization of the company, under the general incorporation laws; meetings were held, the defendants in error were elected officers and directors, agents were employed to sell stock, and substantially everything was done which might have been done, had the organization of the company been complete, except the issuance of insurance. Later, some of the defendants who had been elected directors resigned, and other stockholders, who had not been designated as commissioners, were chosen to succeed them. Finally, after expending approximately $66,000.00 of the $76,000.00 received from stock subscriptions, the abortive company became defunct, never having obtained authority to do business. It is manifest that consideration for payments made for its stock has totally failed, and plaintiff now seeks a return of his money from those who set in motion, and are responsible for, the instrumentality through which he was induced to part with it.

It is well settled in England that, where a corporation has nominally organized only, as in this case, and abandons or never attempts the business for which it was projected, the corporators and promoters are liable, on general principles, to those who purchased and paid for its stock. *Johnson v. Gaslett,* 3 C. B. (N. S.) 569, 3 Mewes Eng. Case Law Digest, 1162-1512; *Nockles v. Crosby,* 3 Barn. & Cress, 814, 10 Eng. Com. Law Rep., 367; *Chiplin v. Clarke,* 4 Ex. 403; *Walstab v. Spotswoode,* 15 Mees. & W. (Ex.) 501; *Green v. Barrett,* 1 Sim. 45, 3 Mewes Eng. Case Law Dig. 1381. In 10 Cyc., at page 265, the principle is stated as follows:

"A person who has paid money for shares in a company which never comes into existence, or who has paid money afterward to a scheme which is abandoned before it is carried into execution, has paid it on a consideration which has failed, and he therefore may recover it back in an action at law, as so much money had and received to his use, unless it can be shown that he has consented to or has

acquiesced in the application of the money which those into whose hands it has come have made of it, and he may maintain a bill in equity for the same purpose. Where a person has paid money to the promoters of a projected corporation under an agreement that the shares shall be issued to him when the company is formed, he will be entitled to recover his money back from them unless the organization of the company is accomplished within a reasonable time."

In 7 R. C. L. 86, the rule is laid down generally that promoters or incorporators who receive payments of subscriptions to stock of a proposed corporation are personally liable for the return of the money paid, in case of failure to perfect the corporation.

In *Miller v. Denman,* 49 Wash. 217, 95 Pac. 67, 16 L. R. A. (N. S.) 348, a statute similar in principle to the one here involved was construed by the court. That statute provides for the formation of trust companies, and among other things it requires that those who are the incorporators shall be the first board of directors, and that prior to doing business the stock shall be fully subscribed and paid-up, and that thereafter a certificate of authority shall issue from the Secretary of State. In construing the statute, and discussing the duties and liabilities of the directors thereunder, the court said:

"Chapter 176, p. 367, Laws 1903, is an act relating to trust companies. Section 2 provides for the execution of a certificate of organization of not less than seven persons mentioned in section 1. These persons, under section 5, constitute the first board of directors. Sections 1 and 2 provide that before the corporation shall be authorized to transact business the capital stock shall be fully paid, and the Secretary of State shall issue to the company a certificate of authority. From these, and other provisions, it is evident that the organization would not be complete until all conditions precedent in the act required had been performed and the certificate of the Secretary of State had been issued. Necessarily subscriptions and payments of cap-

ital stock could only be solicited by the original incorporators, or by their duly authorized agents. They were authorized to receive money on subscriptions, but it was their duty to preserve the same as a trust fund to be used in perfecting the organization, or returned to the subscribers if the enterprise proved abortive. They stood in a position similar to that of the promoters of an ordinary corporation, and incurred at least as much liability. It was not necessary for the appellant to plead or prove that the respondents had been guilty of conspiracy or fraud, although he might properly do so. The respondents assumed certain trusts, duties and liabilities by becoming the original incorporators and directors of the proposed company, the organization of which they intended to perfect in compliance with the trust company act. If they collected less than the original subscriptions on the capital stock, and failed to return the same when the enterprise failed to prove successful, for want of sufficient funds, they violated their trust, and became liable to the subscribers whether such failure resulted from their conspiracy, fraud or negligence. If they permitted a portion of their number to divert the funds to an unauthorized purpose, they were guilty of such negligence and breach of trust as would compel them to respond to subscribers who might thereby suffer loss. It, therefore, is unnecessary to discuss whether the appellant made a case of conspiracy or fraud."

After citing several of the English cases referred to above, and quoting from *Johnson v. Goslett, supra,* the court continues as follows:

"The case of *Hudson v. West,* 189 Pa. St. 491, 42 Atl. 190, is especially applicable to the facts before us, not only on the question of the liability of the original promoters or directors, but also as to the effect of an investment of subscription money claimed to have been made, with the alleged ratification and consent of subscribers. In that case the court said: 'This question seems to be of the simplest character. There was no pretense of any compliance on the part of the defendants with the terms of

the contract. They received the plaintiff's money in consideration that they would form a company and give him stock therein to the amount of $10,000.00, and they did nothing of the kind. They certainly cannot keep the plaintiff's money in these circumstances. Their want of success in the formation of the company is no concern of the plaintiff, and it is no defense in this action.' "

The court then quotes sec. 162 from Alger on the Law of Promoters, as being in point, which reads thus:

"When a subscriber for shares in a projected corporation has paid money thereon in advance to the promoters and the scheme proves abortive, he may recover back his money. This right rests on the failure of the consideration on which the money was paid. But the scheme is not to be deemed abortive until the formation of the corporation has been abandoned, or has become impracticable, or a reasonable time for the formation has elapsed. It is reasonable, in the absence of an agreement to the contrary, that the expense of exploiting the proposed undertaking should, in case it collapses, fall upon the original promoters, and not on those who advanced their money on the faith of the ability of the projectors to do that which they undertake to do."

In commenting upon the authorities this is said:

"We think the principle announced in the above authorities apply with especial force to the facts of this case, and that the defendants, as original directors, occupying a position kindred to that of promoters, would be liable to the plaintiff for the return of his subscriptions, even though they have been guilty of neither fraud nor conspiracy. There was sufficient evidence of breach of trust and failure of duty to require the question of their liability to be submitted to the jury."

Under the statute defendants in error were charged with the specific and express duty of securing subscriptions to the entire capital stock of the company, and of depositing with the Insurance Commissioner $100,000.00, either in cash or approved securities, as a guarantee fund

against company liabilities. That they resigned as directors could in no way alter or affect their duties or liabilities under the statute. They could not avoid these by resigning from the directorate of the company, nor could they, or any of them, be released except upon performance, or by consent of all the beneficiaries, or through appropriate proceedings in a court of equity. Beech on Trustees, sec. 488-489; *Dilliard v. Winn,* 60 Ala. 285; *Ross v. Barclay,* 18 Pa. St. 179, 65 Am. Dec. 616. It is no defense that defendants, or some of them, were not acting as directors when plaintiff purchased his stock, or that they, as individuals, never received the money. Neither can they claim that they did not know or understand that they had been appointed as commissioners, with duties and liabilities such as are now claimed were imposed by the statute. As incorporators of the company they were bound to know the law, and their duty under it. It is not necessary, however, to resort to this principle to charge them with liability, as the record affirmatively shows that they fully understood what their duties were, and the effect of the statute. They adopted advertising matter in the nature of letters, to persuade prospective purchasers that their interests would be faithfully protected, and their money applied accordingly to law, in which is set forth the purpose and intent of the statute as they construed it. These matters establish actual knowledge and complete comprehension on the part of the defendants of the entire situation. A part of one letter so used is as follows:

"In regard to the questions asked in your letter we wish to say that the company was incorporated May 13th, and the amount of business on the books is, of course, nothing at this time, the law requiring that no business can be written until our capital stock is fully paid up and deposited with the State. The stock which has been sold up to date aggregates a little more than $200,000.00 and the amount paid in is small, owing to the fact that the amount subscribed is to be paid on the monthly payment plan.

"You ask in regard to the amount of stock now for sale,

and the treasury stock reserved, and the amount of stock given to original incorporators, officers, etc.  In reply to this, would say that an Insurance Corporation is very unlike most any other corporation; the capital cannot be used for development purposes.  No promotion or treasury stock can be held out.  The ENTIRE capital stock must be paid for and invested in securities, prescribed by the statutes, and remain in the custody of the State, unimpaired.  The statutes of this State require that the Superintendent of Insurance make an examination annually with an appraisement and valuation of the assets and liabilities of each Legal Reserve Life Insurance Company organized and operating under its laws.  As a result, no such organization has failed since the creation (in 1873) of the legal reserve requirements."

A portion of another letter sent out by the vice-president and general manager reads as follows:

" * * * We have no hesitancy in asking you to put a small amount of money in stock of this character, for as far as the possibilities of loss are concerned, I would say they are eliminated entirely.  After the company is formed the entire capital stock must be held by the State of Colorado in securities satisfactory to the Commissioner of Insurance, and until the entire capital is paid in, the money collected is held intact by the Central Savings Bank & Trust Company and will draw 3% interest while deposited and should such a thing occur that the Company would not be formed, the money you have paid will all be returned.  If you wish more evidence along this line that what I say is true, you may make further inquiries by writing the Central National or Saving Bank as above referred to."

When these, and similar, communications were sent to prospective investors, none of the defendants had resigned as directors of the company.  The written authority from the Commissioner of Insurance was accepted by the defendants, and they embodied an interpretation of the statute in their advertising literature, and set in motion

machinery for extracting money from the public. In law they must be held to have undertaken the trust, charged with full knowledge of their duties and responsibilities thereunder, and it is too late now to change or modify the situation. Once having put their hands to the plow, the defendants may not voluntarily turn back, or abandon the enterprise, and thus escape liability.

Some of the defendants contend that they cannot be held because the company as such, and not the commissioners, received stock subscriptions, dissipated the funds, and did the other acts of which complaint is made. The records of the company show that the defendants were present when action was originally taken relative to stock subscriptions, and as to other matters concerning which they were empowered to act, as commissioners under the statute. At one directors' meeting one of the defendants was elected president, one vice-president and general manager, one secretary and treasurer, one chief medical director and one general counsel. They were present at other meetings where money was paid out, salaries fixed, stock salesmen engaged, and stock selling arrangements perfected. It is contended that these, and similar acts, show, or tend to show, that the company and not the statutory commissioners took charge of the stock subscriptions, collected the money, and spent it in violation of the statute, but to us they appear conclusive of the fact that the defendants were cognizant of every act done, and that all that was done was with their advice, approval and assistance, and that but for their participation and sanction nothing whatever could have been done. Extracts from the company minute book show that the defendants merely employed the company as a convenient instrument with which to carry out their plan of organizing and perfecting it. That this is an effective way to complete such an organization is apparent; and had the defendants been mindful of their statutory duty, this method of performing it might well have been the best that could have been adopted. In law, however, the company was merely the agent of the commissioners;

its acts, its knowledge, its contracts and the funds arising therefrom, were all theirs, and they are liable in law for the result of such agency. Indeed, under the facts of this case, the defendants ought not to be heard to question or deny liability. They were charged with the duty of collecting and conserving the fund in question, and if they permitted another to usurp their functions, and collect and dissipate such fund, they are as clearly liable as though they did the thing themselves.

It is urged also that the complaint is defective in that the United States Postal Insurance Company is not joined as defendant. The company had, and has, no legal existence as an insurance company, and as we are now advised, is entitled to no consideration from any standpoint. It has no legal rights and no legal status, and is not asking to be made a party. The question here involved is one solely between purchasers of stock and these defendants. The attempt seems to be to use the projected company as a shield to aid defendants in escaping personal liability, and this should not be countenanced.

The record plainly discloses that the defendants were responsible for everything done in connection with the attempt to perfect the organization of the proposed insurance company, and while actual fraud is not charged or proven, it does appear that they were grossly negligent and utterly regardless of, and totally indifferent to, their duties and responsibilities under the law, as commissioners, and this of itself, without more, is sufficient to fix liability.

The intent of the statute is so clear that there is no room for a reasonable difference of opinion about it. It was intended thereby to guard against and make impossible the very thing which happened to this company. If those who were designated under the statute to administer its affairs, during the formative period, had properly performed their duties and functions, the calamity which overtook the company through a dissipation of its assets, could never have come upon it.

Judgment reversed and cause remanded to the trial court for further proceedings in conformity with the views herein expressed.

Decision *en banc.*

Mr. Justice Teller not participating.