## No. 11,067.

### ALDERMAN, ET AL. *v.* THIMGAN.

Decided October 6, 1924. Rehearing denied December 1, 1924.

Action to recover money paid on stock subscription. Judgment for plaintiff.

*Affirmed.*

*On Application for Supersedeas.*

1. CORPORATIONS — *Organization — Liability to Stock Subscriber.* Where there is only a nominal organization of a corporation, which is never perfected, the promoters are liable to those who purchase and pay for stock, in the absence of a contract to the contrary.

2. INSURANCE—*Organization of Companies—Stock Subscription.* Under the provisions of c. 99, S. L. '13, concerning insurance companies, it is held that a stock subscription agreement did not bind the subscriber to contribute 20 per cent of the amount of his subscription, paid in cash, toward organization expenses. The organization not being completed, judgment against the promoters for the return of the 20 per cent cash advancement, is affirmed.

3. *Company Organization—Subscription Note Construed.* Where the subscriber to stock in an insurance company to be organized, advanced 20 per cent of the amount of his subscription in cash, giving a note for the balance under the terms of which the 20 per cent could be retained by the company as liquidated damages in the event it returned the note to the subscriber, it is held that it was the intention of the parties that the company could retain the 20 per cent on the return of the note, only if it completed its organization and proceeded to do business.

*Error to the District Court of the City and County of Denver, Hon. L. C. Stephenson, Judge.*

Messrs. SABIN & MCGLASHAN, for plaintiffs in error.

Messrs. MAST & MEIKLE, Mr. F. J. KNAUSS, for defendant in error.

*Department Three.*

MR. JUSTICE SHEAFOR delivered the opinion of the court.

PLAINTIFFS in error were defendants in the trial court, and defendant in error was plaintiff in that court. The parties will be so designated here. The parties ask that the case be determined upon this application for supersedeas.

This action was brought by the plaintiff in his own behalf, and on behalf of seven others, who assigned their claims to the plaintiff, and all of the several causes of action are identical in character, differing only in the amounts sued for and the name of the subscriber.

It appears that the defendants associated themselves together about November 20, 1918, to form an insurance company known as The Preferred Risk Fire Insurance Company, with an authorized capital of $250,000, divided into 2500 shares of the par value of $100 each. The articles of incorporation 'were submitted to the Attorney General and approved by him, whereupon the Insurance Commissioner entered an order permitting the defendants to open books for the subscription of stock. The books were opened and the subscribers for stock executed and delivered signed subscriptions. The subscriptions, so far as material to state them, were in the following form:

"Book No.

Receipt No.         Receipt—(In Duplicate) No. Shares——
            The Preferred Risk Fire Insurance Co.
                    Denver, Colorado.

I hereby subscribe for —— shares of the par value of One Hundred Dollars each, of the capital stock of The Preferred Risk Fire Insurance Company, said stock to be nonassessable, for which I contract and agree with the said Company, to pay therefor at the rate of Two Hundred Dollars per share, which is to create capital and surplus and pay the necessary organization expenses which shall not exceed 20 per cent of the total amount received.

The total amount of......................dollars accompanies this subscription.

It is fully and distinctly understood and agreed that no conditions or agreements, other than those contained herein, will be binding or of any effect, hereunder, nor will this Company be in any way bound by any misrepresentations made by any agent or solicitor of this company."

In connection with the subscription, the parties subscribing for stock, executed notes, which, together with the subscription blank, the defendants claim constitute the contract between the parties. The following is a copy of the note given by the plaintiff, and is set forth as a defense in the answer.

"$800.00                    .                August 20, 1919.

On or before six months after date, for value received, I promise and agree to pay to The Preferred Risk Fire Insurance Company at the office of E. P. Snowden, Denver, Colorado, the sum of Eight Hundred Dollars with interest thereon from date, at the rate of eight per cent per annum payable at maturity.

This note is given for subscription to 5 shares of the capital stock of The Preferred Risk Fire Insurance Company of this date, which said stock is not to be issued until this note is paid in full, and I hereby designate and appoint E. P. Snowden, Trustee, to hold this note and specifically contract and agree that in the event I fail to pay this note promptly when due, it shall be optional with The Preferred Risk Fire Insurance Company to request the said E. P. Snowden to surrender this note to me, in which event 20 per cent of the amount of my said subscription shall be retained by said company as its liquidated damages, and the balance, if any, shall be returned to me, in cash, stock or both and thereupon this Note and the said subscription to said stock shall become null and void, or said company may at its option request said E. P. Snowden to deliver said note to it, and said company may enforce the collection thereof by legal proceedings, in which event I agree to pay in addition to the amount of

this Note a reasonable attorney's fee, to be taxed as costs.

(Signed)    David Thimgan."

The subscriber at the time of the delivery of the note and the subscription, paid in cash 20 per cent of the subscription. This suit is brought to recover the 20 per cent paid.

The claim of the defendants is, that the plaintiff is not entitled to recover the 20 per cent, because it is stated in the subscription that the amount subscribed was to "create capital and surplus and pay the necessary organization expenses, which shall not exceed 20 per cent of the total amount received," and because it is stated in the note, "it shall be optional with The Preferred Risk Fire Insurance Company to request the said E. P. Snowden to surrender this note to me, in which event 20 per cent of the amount of my said subscription shall be retained by said company as its liquidated damages, and the balance, if any, shall be returned to me, in cash, stock or both, and thereupon this note and the subscription to said stock shall become null and void."

The projected insurance company never was organized. It was abandoned and the attempt to organize became abortive on or about the 31st of August, 1920. It appears to be the contention of the plaintiff that the company having failed to obtain sufficient cash, from subscriptions to its capital stock, to authorize it to do business under the laws of Colorado, and having abandoned the enterprise, the defendants, who were permitted to open stock books for subscriptions, are liable to the subscribers and makers of the notes for the amounts paid by them.

The notes were returned to the subscribers and nothing appears to have been paid under the subscriptions except the 20 per cent of the amount subscribed. It appears that this 20 per cent paid by the subscribers was used by Snowden in the promotion of the company, in addition to considerable more that was paid by him personally. The defendants never received any of the subscription money. The defendants claim that the plaintiff is estopped to ask

for a return of the 20 per cent, because the subscription contract was a consent to the use of said 20 per cent to pay the organization and promotion expenses of the company. They further claim that the plaintiff, and his assignors, made it impossible, by their own acts, for the defendants to complete the organization of the company, and to obtain sufficient cash capital to qualify and commence business, in that they failed to pay the notes when due.

The defendants also claim that by reason of the subscription contract, and the provisions of the notes given, the subscribers became parties to the transaction and joint promoters of the company. No stock certificates were ever issued to the subscribers. It appears, that about forty persons in all subscribed for stock, with notes aggregating $46,560, and that cash was received amounting to $11,640, and that commissions had been paid amounting to $9,894. Under date of August 30, 1920, the Insurance Commissioner wrote counsel for plaintiff a letter stating, among other things, "I therefore thought it best for the interest of all subscribers to the stock of the company, that the company's affairs should be liquidated. To this end I have instructed them to return all notes to the makers. I did not understand that any payments had been made on the notes, but if there have been any, all such amounts should also be returned to the subscribers for the organization stock."

In a communication from the company to Mr. Meikle, attorney for the plaintiff, dated September 2, 1920, it was stated, "For your information, we beg to advise that this company expected to have a sufficient amount of its stock sold to open its doors at the time you state in your letter. However, there was not enough of this stock sold, at that time, to make it possible for the company to commence business, even though it had been in a position to do so otherwise."

Other correspondence passed between the parties, which was to the effect that the promoters had been unable to

sell sufficient stock to enable the company to proceed. In a letter dated March 15, 1920, from the company to one of the subscribers to the stock, the company stated, "If for any reason we should not be able to open the doors of this company within a reasonable time, it is our intention to not only return the notes that were given with the subscriptions for stock, but also to return the 20 per cent that was paid the agents in the sale of this stock. We do not expect to ask the subscribers to pay out on the notes until the doors of the company are opened for handling the business." On June 30, 1920, the company wrote to the subscriber as follows, "You can rest assured of one thing, Mr. Bauserman, and that is this, even though we would open the doors of our insurance company to-morrow, it is now our intention to call upon those who have given their notes in payment of stock and give them the option of going ahead with the business or the return of their notes."

These letters may be valuable only as an aid in the construction of the contract. It would appear from these letters, that the incorporators did not intend to ask for payment of the notes, nor did they expect to retain the 20 per cent, unless the company was opened for the handling of business.

Plaintiff contends that under the laws of this state, the commissioners are trustees of an express trust and their duties are to conserve the funds received from the sale of stock, and to deposit the statutory amount with the Commissioner of Insurance, and until the stock has been fully subscribed and the required amount of money was deposited, the defendants are personally liable for the preservation and integrity of such fund. Plaintiff further contends that under the law and under the contract, the promoters could not deduct 20 per cent of the subscription for expenses, unless they actually completed the enterprise and raised the necessary capital and surplus as required by law. It appears to be well settled in this jurisdiction that where a corporation is nominally organized

only, and the organization is never perfected, but the project is abandoned, the incorporators and promoters are liable on general principles to those who purchase and pay for stock, in the absence of a contract to the contrary.

In the instant case, the defendants claim that there was an agreement to the contrary; that the plaintiff and his assignors, by their stock subscription agreements, and the notes, expressly agreed that 20 per cent of the amount subscribed might be used for promotion expenses. This Court is, therefore, called upon to construe the subscription contract, in connection with the notes, and determine their legal effect.

The trial court found, inter alia: "That the implied obligation on the part of the defendants was to organize a going insurance company; that at the time they took the subscriptions from the plaintiff and his grantors, or assignors, they had no authority except the authority to secure subscriptions to the stock of the company, and those subscriptions were taken on the consideration that they, on their part, would organize the company and put it in shape for business, and on the part of the subscribers that they would pay. I find that there is nothing in the contract of subscription, or in the note given on any subscription, that warrants the defendants as promoters, to use 20 per cent of the amount of subscription for organization purposes; but if there should be construed to be such a warrant, the consideration for it has failed, and that the plaintiff in this case is entitled to recover on each of his causes of action." And the court rendered judgment accordingly. The trial court, and apparently the attorneys for plaintiff, relied upon the following cases: *Greiger v. Salzer,* 63 Colo. 167, 165 Pac. 240; *Lucero v. Life Ins. Co.,* 67 Colo. 322, 184 Pac. 379; *Stearns v. Sopris,* 4 Colo. App. 191, 35 Pac. 281.

The contention of the defendants, that the plaintiff and his assignors were responsible for the failure of the company to proceed with its organization and the contemplated business, cannot be sustained, for the reason it is apparent

from the record that the parties were willing and able to pay their notes; but even if they had done so the company would still have been unable, for lack of sufficient subscriptions, to have proceeded with its organization. It is quite plain that the plaintiff and his assignors did nothing to prevent the insurance company from proceeding with its organization.

In *Greiger v. Salzer, supra,* and *Lucero v. Life Ins. Co., supra,* no such contract was before the court as is presented in the instant case, but it is clear that the plaintiff is entitled to recover unless his subscription contract, together with his note, is to be construed as contended for by defendants.

The subscription contract and the note must be construed in the light of the statutes in force at that time.

Section 25, c. 99, Laws 1913, so far as necessary to quote the same, is as follows: "No joint stock fire or life insurance company shall be permitted to do any business in this State, unless it is possessed of an actual paid-up cash capital, as follows: Fire insurance companies with territory not limited to Colorado, of not less than two hundred thousand dollars ($200,000); fire insurance companies, the business of which is limited to Colorado only, not less than fifty thousand dollars ($50,000)."

Section 32 of the same chapter reads: "It shall be unlawful for any corporation organized under the laws of this State for the purpose of conducting an insurance business of any kind, to pay more than twenty per cent (20%) of the total amount realized from the sale of its capital stock, whether in cash or notes, for the organization of said company. In every case the organization expenses shall be paid out of the surplus funds of the corporation, and the said twenty per cent (20%) shall include commissions paid to agents for the sale of stock, rent, clerk hire, literature, and all other expenses of every kind, and nature, and all obligations incurred, up to the time that application is made for a license to do an insurance business."

Section 30 of the same chapter provides, among other things, that the Attorney General shall certify and deliver back the articles of incorporation to the Commissioner, who shall commission the persons named in the certificate of incorporation, or a majority of them, to open books for the subscription of stock in the company at such time and place as they shall deem it convenient and proper, and to keep the same open until the full amount specified in the certificate of incorporation is subscribed.

The questions then arising are: Did the subscribers contract with the projected company to the effect that they would allow all the 20 per cent in cash to be applied to the organization expenses, in case the company failed to complete its organization, and if so, was such contract based upon a sufficient consideration?

The subscription contract, considered separate and apart from the notes, merely provides that the subscriber shall pay $200 per share, which, (undoubtedly with other subscriptions) were to create capital and surplus and pay the necessary organization expenses, which should not exceed 20 per cent of the total amount received. We cannot construe this language as constituting a contract which bound the subscriber to pay or contribute 20 per cent, the amount paid by him in cash, toward the expenses of organization of the company. There is nothing more stated in the subscription contract than what the law required. The total subscriptions, if paid in full, would not create capital and surplus sufficient to entitle the company to obtain a license, and as a fact the company never completed the organization and never obtained a license to do business. The law expressly requires that the organization expenses shall be paid out of the surplus funds of the corporation, and in this instance there were no surplus funds.

The provision in the note cannot be construed otherwise than that the subscriber, if he failed to pay his note promptly when due, might have it surrendered to him if the company so elected, and in that event the subscriber

agreed that 20 per cent of the amount of his subscription should be retained by the company as its liquidated damages, and that it was the intention of the parties that the company could retain the 20 per cent advanced by the subscriber only in the event that the company was able to procure sufficient subscriptions to enable it to organize, obtain a license and proceed to do business. There was no company in existence at the time the notes were surrendered, authorized or empowered to transact business. The promoters' attempt to complete the organization of their company became abortive by reason of the very fact that they were unable to procure sufficient subscriptions, and funds, with which to organize and obtain a license in accordance with the requirements of the statute. To hold otherwise would be to say that the subscriber was willing to advance 20 per cent of his subscription for stock to pay promotion expenses, himself becoming a joint promoter with the defendants. In other words, if the projected company failed, the subscriber was willing, according to defendant's contention, to share in the loss sustained by the company to the extent of the 20 per cent advanced by him. This is so manifestly unfair and unreasonable as to make it impossible to hold that the subscriber contemplated any such thing, and the letters, heretofore quoted, fully indicate that the company itself expected nothing of the kind. We think the trial court did not err in its findings and judgment.

The supersedeas is denied and the judgment affirmed.

MR. JUSTICE ALLEN sitting as CHIEF JUSTICE, and MR. JUSTICE CAMPBELL concur.